## F. E. CLARK v. STATE.

No. A-6962.   Opinion Filed May 24, 1930.
(288 Pac. 489.)

P. H. Moroney and William F. Collins, for plaintiff in error.

J. Berry King, Atty Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DAVENPORT, J. The plaintiff in error, hereinafter. called the defendant, was informed against jointly with Chauncey M. Davis and Earl R. Kelley, charged with forgery, was tried separately, convicted and sentenced to imprisonment in the state penitentiary for a period of seven years. Motion for new trial was filed, considered, overruled, and defendant excepted, and the case appealed to this court.

To sustain the allegations in the information the state called J. P. Flanagan, who testified in substance as follows:

"On August 28, 1926, I began negotiating with the defendant respecting the purchase of the royalty interest of Leonard D. Ingram, in the southwest quarter of section 2, township 19 north, range 7 east, Creek county, Okla. I began negotiations with the defendant in the office of H. R. Johnson. Johnson and the defendant discussed the runs, and Mr. Johnson told the defendant that I was joining in the contemplated purchase of the royalty. The defendant stated he had to pay $27,500 to the negro and

$2,500 to some one else, and wished to make $5,000 himself. I agreed to pay $36,000 for the royalty interest. I told the defendant I did not know Leonard Ingram, and that he would have to buy the royalty from Ingram, and that I would in turn buy it from him. The defendant stated he had the inside track; that a Muskogee bank held a mortgage for $15,000, and that he had left his check in payment of that sum, and was working with Napoleon Scott, who was getting Ingram to make the sale. I was later advised that Ingram would be in the office the following day. The defendant then stated he would go to Sapulpa with Ingram and have the instrument recorded before the money was paid. On September 2, 1926, the defendant and Johnson, accompanied by the colored man, drove to my home. I told the defendant that Earl Kelley was acquainted with Ingram, and the defendant stated Kelley had identified him. Defendant stated he had a deed, and he would drive to Sapulpa and place it on record. Defendant, Johnson, and the negro that was with them left, and I saw them later at the Exchange National Bank building.

"The bank held a draft drawn by Ingram upon the defendant for $12,500. The defendant gave me a deed, and I delivered him a check for $36,000 for the property. Exhibit 1 is the deed from Ingram to the defendant. Exhibit 3 is the deed from the defendant to me. Exhibit 4 is a receipt signed by C. H. Garrett for $15,000. There was in the bank at the time of this transaction a check for $15,000 from the defendant, upon which was written, 'Full payment of mortgage and note on the Southwest 2-19-7, to First National Bank of Muskogee.' The defendant promised to get a release of the mortgage. I took a transfer order to the Prairie Oil & Gas Company. Later I was served with a summons in the suit of Leonard D. Ingram to quiet title. An investigation was begun. Johnson, the defendant, and myself went to Muskogee and tried to locate Napoleon Scott. We learned that he was away. We went to the office of Clark Compton, chief of police of Muskogee, and tried to locate C. H. Garrett. Compton said that Clu Garrett was the only Garrett he

knew in that community. The defendant talked to Clu Garrett, and he denied any knowledge of the transaction. Defendant told me he paid Kelley $2,500. The whole deal was consummated in the Exchange National Bank on September 2, 1926. I don't recall that Clark told me at any time that he knew Leonard Ingram, or that he had any dealings with Ingram."

H. R. Johnson in substance testified for the state:

"I began negotiations with the defendant for the purchase of this royalty in August, 1926, when the defendant appeared at my house claiming to have the royalty interest for sale. We examined the wells and the runs. Defendant stated he was able to deliver the property and would have Leonard Ingram in the Exchange National Bank on the 1st day of September, 1926. He failed to appear. The defendant said Ingram had given him a mortgage and blank deed. On September 1st the defendant advised me that Leonard D. Ingram would be there the following morning, and about 8 o'clock a. m., the morning of the 2d, the defendant appeared at my home with Ingram. We went down to the Exchange National Bank. The defendant Clark went out of the bank and brought in Leonard D. Ingram, and Ingram signed the transfer order. When the order was signed, there was $27,500 paid to Leonard D. Ingram. Mr. Flanagan suggested that Ingram take a cashier's check, which he declined to do. Mr. Flanagan then suggested to the defendant that it would be a good idea for him to go back with the boy to Muskogee, and see that the negro boy arrived there safely with the amount of money he had."

Chauncey M. Davis also testified in substance for the state that he was acquainted with Earl Kelley, had known him since 1924; saw him on the morning of September 1st, in Muskogee. Kelley asked the witness if he would like to make some money, and witness answered in the affirmative; drove with Kelley in a Ford coupe to Tulsa, the night of September 1, 1926. When they reached Tulsa

they went to the apartment of the defendant, and Kelley got out and went into defendant's apartment. Kelley and the defendant came out together, and—

"We got in a Pierce-Arrow coupe. Kelley went in his car, and the defendant and I drove in the Pierce-Arrow. We three drove to the northwest part of the city to the residence of a man by the name of Boyles, where Kelley introduced the witness to Boyles as Mr. Davis. We returned to the Security National Bank building, where Kelley and Boyles got out of the car. The defendant and I went on to Fourth and Boston and parked. The defendant then got out of the car and left me alone in the car. A man was waiting in the lobby of the Clinton building. The defendant and Kelley got out of the car, and the three went upstairs and remained for some time. This was about 3 o'clock in the morning. I remained in the car and Kelley brought me a sandwich and a bottle of beer. Kelley then started away, and reached in his pocket and pulled out a piece of paper, and said he had better have me sign this, and told me to sign Leonard D. Ingram. I told him he must be crazy. 'All right, big boy, you are going to sign this, or we are going to do away with you.' Kelley pulled out an automatic, and the defendant told me I was going to sign because Mr. Johnson had been looking for him to produce for three days.

"Kelley called me Chauncey and nothing else. They told me to sign the paper as I was going to sign it at the bank, and said we have to go to the bank; Kelley said, 'Write Leonard D. Ingram, N. B. 210.' I started to add, per C. M. D.' and he said, 'Don't do anything like that'; Mr. Clark says, 'You are not smart as you think, I know what I am doing, I have studied this for years and I forgot a lot of their stuff.' He gave me a long lecture. After the paper was signed, the defendant put it in his pocket. This paper I signed there was torn up. Exhibit 1 I signed in the Exchange National Bank. We went to the home of Lee Smith or Al Westerman about 7 o'clock and returned to the bank. Some papers were made out, and I signed something as Leonard D. Ingram, N. B. 210. The

defendant impressed upon me that all the police and every-thing was behind him and to do anything he stated. On the way out to Mr. Johnson's house defendant told me to be careful, that he would do away with me if I made a balk. The defendant also told me to insist on cash. At Sapulpa I remained in the car while the defendant went to the abstract office. While in the bank, the mortgage was returned and I started to put it in my pocket, defendant tore the end off, and I received the money, $15,000 in one roll and $12,000 and a $1,000 bill in another; I put them in my pocket. The defendant and I then left in the Pierce-Arrow and went to the defendant's apartment. The defendant took me in a room and told me to give him that money; I pulled it out and handed it to him. He told me to get out of town, that he would take me to Muskogee. Defendant told me to go to Los Angeles or old Mexico, that he would bear the expense, and that if I returned he would have me put in jail. Defendant gave me $3,000 and said that should run me two years. After that the defendant gave me three $50 bills, and told me never to tell any one about it, as he knew what he was doing. Kelley came and took charge of me and drove out the Bixby road, and defendant soon appeared, and had me prepare a lease and sign it in the name of C. H. Garrett. Exhibit 4 is the paper I signed; did not see Napoleon Scott upon arriving at Muskogee.

"I had known Leonard D. Ingram since 1919; I had worked for his stepfather. I had known Napoleon Scott since 1905. I tried to dispose of the Ingram royalty interest in July, 1924. I knew it was in Creek county; first saw the defendant in Tulsa, September 2, 1926; was not introduced to the defendant, and did not tell the defendant my name; had had dealings with Kelley before this time."

F. A. Boyles then testified to knowing Earl R. Kelley and to meeting the defendant in September, 1926; that Kelley came to the defendant's home and wanted to get his key to go to the office and see the roll book.

A. H. Westerman testified to the transaction which occurred in the Exchange National Bank, and that he saw the instrument signed, and that the negro signed the instrument and acknowledged he signed the same as his free voluntary act and deed. Lee Smith corroborated in substance the testimony of the witness Westerman as to what took place in the bank between the parties. This is in substance the testimony introduced on behalf of the state.

The defendant, testifying in his own behalf, stated he met H. H. Johnson the latter part of August, 1926; met E. R. Kelley about the middle of that month; prior to that time he had never had any dealings with E. R. Kelley; that he first saw the negro about 1:30 the morning of September 2, 1926. He never had any business with Leonard D. Ingram, and did not know there was such a negro in existence until about ten days before the deal was consummated.

"The sale of the royalty of Leonard D. Ingram was first mentioned to me by Napoleon Scott; Kelley called me and we met in the Clinton building. We went to Muskogee with Kelley in Kelley's car. Up to this time I had never seen Napoleon Scott. When we went to Muskogee, Scott claimed he could go to Chicago and get Leonard Ingram if some one would pay the expenses of the trip, and that he would bring Ingram back and arrange for the sale of his royalty. On the return from Muskogee to Tulsa Kelley told me all about the royalty, and I then asked several parties if they had any prospective purchasers for the royalty interest. Mr. Maddox asked me to meet him the next morning; Napoleon Scott said he could buy this royalty for $27,500; Maddox and I went to the office of Mr. Johnson where the property and price desired was discussed. Mr. Johnson and I went and checked the property. I got an abstract on the property at Sapulpa. Two or three days prior to the actual transfer I met Mr. Flanagan and he was looking to Kelley to make the deal through

Scott. Kelley asked me for money for Scott to make the trip to Chicago. This was five or six days before the deal was closed. Kelley told me Scott had gone to Chicago. This was the first deal I ever had with Creek freedmen. The negro, who later claimed to be Chauncey Davis, came to my apartment September 2d, and was introduced to me as Leonard Ingram and asked me if I was the man who was supposed to be buying the royalty. He presented a check for $15,000 which I had given to Kelley, and asked me if I was ready to pay the other $12,500. The negro did not eat breakfast at my house. I took him to a restaurant, later I came back and got the negro and rode around and discussed his life and what had been learned from the abstract. I was convinced he was Leonard D. Ingram. Before going to Mr. Johnson's, the negro signed the royalty deed to me, and it was deposited in the Exchange National Bank with a draft for $12,500, and my check for $15,000 for the deed to me was acknowledged. We drove down and asked Kelley if the boy was the one for whom we were looking, and Kelley and the negro had some conversation, and Kelley finally advised me he thought he was the boy. We then went o Johnson's house, and Johnson asked who we could get to identify the boy. I stated I did not know, and Johnson said the only one he knew was Earl Kelley. I told Johnson what Kelley said, and Johnson said that was poor identification. We then drove to Flanagan's, and some one suggested that the boy he brought to the office of Johnson, and we finally decided to go into the bank and close the deal there. After the deal was closed, Johnson and Flanagan suggested that I take the negro to Muskogee, and I did so, arriving at Muskogee about 2 o'clock in the afternoon. We drove down Second street and stopped the car. The negro and Scott were to get a written release for the additional $15,000. I had seen Scott once, and I took the negro at Muskogee to be Scott; received the receipt the following day, in an envelope I had addressed to myself and left with the clerk of the Baltimore Hotel, Muskogee. I first learned there was a question about the validity of the transfer when a little negro went up to the Johnson office and claimed somebody had

forged this deed. The negro was named Chandler. He filed a suit against me and others in the federal court to quiet title to Leonard D. Ingram, and cancel the deeds."

In rebuttal G. J. Eastwood testified that he had charge of the books of the Exchange National Bank, and had the records of the individual checking accounts; that on the 2d day of September, 1926, the defendant's balance was $2.10; August 27, 1926, defendant's balance was $2.60.

J. P. Flanagan, called in rebuttal, stated that:

"After the defendant Clark received the deed he did not ask Mr. H. R. Johnson or myself to go with him to Sapulpa; he made the remark that he was going to Sapulpa to record the deed, with the idea of seeing there was nothing ahead of it. I did not make any agreement to meet him at the bank at 10:30. I was ready to buy the property when he was ready to deliver it."

Mr. Johnson was called, and testified that, on the day of the delivery of the deed to Mr. Flanagan, Mr. Flanagan paid $36,000. Mr. Clark did not ask him to go with him to Sapulpa. He further testified:

"I did not make any statement to the defendant that I wanted him to put me out there as I did not want to be seen uptown with the negro; nothing like that occurred. I did not make any statement to him that I did not want the negro to be seen down town in the business part. We came over from Mr. Flanagan's to Eighteenth street, and north from Eighteenth to Boulder and north on Boulder to Fourth and Boulder, that was the nearest to my office." On cross-examination the witness stated that he did not have any conversation with Mr. Maddox that morning or the day before. "I do not know what Mr. Maddox was paid. I recall receiving $200 from F. E. Clark; this was for money I had loaned Earl Kelley in 1924."

The defendant has assigned 20 errors alleged to have been committed in the trial of his case. The defendant, in

discussing his first assignment of error, urges, in addition to the assignment in the original brief, that the information in this case was and is insufficient, and his demurrer leveled against the same should have been sustained. The defendant sets out in his brief a copy of the information, and the deed attached to the information as an exhibit, and urges that the motion of the defendant to quash the information, for the reason that the facts stated therein are insufficient to constitute a public offense against the defendant; that the information is fatally defective, for the reason that there is a fatal variance between the purport and tenor clause of the information. The defendant, in said information, is charged with forging the name of Leonard D. Ingram to certain instruments in writing, wherein it is alleged that such instrument in writing purports to transfer and convey to one F. E. Clark the right, title, and interest of the said Leonard D. Ingram, in and to the following described lands: Describing the same as the southwest quarter of section 2, township 19 north, range 7 east, Creek county, Okla.; that the language used in the purport clause conveys a fee-simple title in and to said land; and the defendant further contends that, as shown by an inspection of the tenor clause attached to said information, the forged deed does not convey, or purport to convey, to the said F. E. Clark any interest in the said real estate or fee-simple title in or to said land, but only conveys, according to the tenor thereof, the right, title, or interest of the said Leonard D. Ingram in and to an undivided one-half interest in all the oil and gas and other mineral in and under the said land that may be produced.

It is further urged by the defendant that in the purport clause of the information the property alleged to have been conveyed by the forged instrument is described

as follows: The right, title, and interest of the said Leonard D. Ingram in and to the southwest quarter of section 2, township 19 north, range 7 east, Creek county. In the tenor clause, conveys an undivided one-half interest in all the oil and gas and other minerals in and under said land that may be produced, together with the right of ingress and egress at all times for the purpose of mining, drilling, and exploring said land for oil and gas and other minerals, and removing the same therefrom.

The defendant in support of his contention sets out in full the case of Cook v. State, 23 Ariz. 55, 201 Pac. 397, which he says by analogy throws some light on the question raised in his assignment. A careful study of this case shows that the instrument set out in the information and the proof were different, and thereby is not by analogy in point in this case. In this case the alleged forged instrument is attached to the information, and described as Exhibit A. The proof shows that the copy attached to the information is the same as the forged instrument introduced in evidence. The Supreme Court of Oklahoma has decided in a great many cases that, where a written instrument is made the foundation of a civil case, the original or copy thereof should be filed as an exhibit to the complaint, and, in the case of a variance between the complaint and the exhibit, the exhibit must control. Southern Surety Co. v. Municipal Excavator Co. et al. 61 Okla. 215, 160 Pac. 617, L. R. A. 1917B, 558.

We hold that in this case a copy of the alleged forged instrument was attached to the information, which is controlling as to the offense alleged against the defendant, and that the demurrer of the defendant to the information was properly overruled.

The second assignment urged by the defendant is the misconduct of the court during trial of the case. The

record has been read with a great deal of care, and, while there were many statements made by the court that should not have been made, yet we fail to find any statement made by the court of sufficient importance to indicate that the court was biased or prejudiced against the rights of the defendant, or that he had said anything which tended to prejudice the right of the defendant before the jury. This assignment is not of sufficient merit to justify the court in reversing the same.

The defendant in presenting his third assignment urges that the evidence in this case is wholly insufficient to support the verdict and judgment rendered against him, and that his demurrer interposed at the close of the state's evidence should have been sustained. With this contention we cannot agree. The testimony is conclusive that the defendant in this case began negotiations with the witness J. P. Flanagan for the purchase of the royalty interest of Leonard D. Ingram for the lands described in the information, and that the negotiations continued until about the 2d day of September, 1926, when the defendant, acting with Chauncey M. Davis and Earl R. Kelley, presented Chauncey M. Davis to the said J. P. Flanagan and introduced him as Leonard D. Ingram; and the defendant had a purported deed, which he claims had been signed by Leonard D. Ingram, to a one-half interest in and to all the oil and gas and other minerals in and under the lands described as belonging to Leonard D. Ingram, N. B. 110; that the said defendant and the negro claimed to have been Leonard D. Ingram, who subsequently developed to be Chauncey M. Davis, claim to have gone to Sapulpa and filed the mineral deed, stated the deed had been filed, and that there was nothing against it, and the deal was closed, and the defendant in this case delivered a deed from himself to J. P. Flanagan, and the said Flanagan paid the

negro who claimed to be Leonard D. Ingram, who was afterwards found to be Chauncey M. Davis, the sum of $36,000. The testimony in this case shows beyond question that the purported conveyance of the royalty interest from Leonard D. Ingram to F. E. Clark was a forgery, and that the defendant in this case was a party to the forgery. Under the record in this case no unbiased jury could have found a verdict other than a verdict of guilty. The evidence is amply sufficient to sustain the conviction.

The defendant, under his fourth assignment, contends that the court committed prejudicial error in allowing the jury to separate in the absence of the defendant and his counsel, and because of said separation his rights were prejudiced. We have read the record and examined the same very carefully to see whether or not there was any misconduct on the part of the jurors during the separation of the jury, and have reached the conclusion that the rights of the defendant were not prejudiced by reason of the court permitting the jurors to separate before the case was finally submitted to the jury.

The defendant complains in his fifth assignment of the instructions of the court. We have examined the instructions, and find, taking them in their entirety, they correctly stated the law applicable to the facts in this case.

There are other errors assigned that are not discussed in this opinion, for the reason that, after a careful examination of the same, they are not sufficient to justify a reversal. There are no errors in the record sufficient to warrant the court in reversing this case.

The judgment is affirmed.

EDWARDS, P. J., concurs. CHAPPELL, J., not participating.