## EARL R. KELLEY v. STATE.

No. A-7553. Opinion Filed June 6, 1931.
Rehearing Denied June 27, 1931.
(300 Pac. 436.)

250

Breckinridge & Bostick and John L. Ward, for plaintiff in error.

J. Berry King, Atty. Gen., Smith C. Matson, Asst. Atty. Gen., and Hagan & Gavin, for the State.

DAVENPORT, P. J.   The plaintiff in error, hereinafter called the defendant, was informed against jointly

with Chauncey M. Davis and F. E. Clark charged with forgery, was tried separately, convicted and sentenced to be imprisoned in the state penitentiary for a period of seven years. Motion for new trial was filed, considered, overruled, exceptions saved, and the case appealed to this court.

To sustain the allegations in the information, the state called the following witnesses: J. P. Flanagan, on behalf of the state, testified, in substance, that:

"Some time in August, 1926, I began negotiations with F. E. Clark for the purchase of the royalty interest of Leonard D. Ingram in the southwest quarter of section 2, twp. 19 north, range 17 east, Creek county, Okla., I first met Mr. Clark at the office of Mr. Johnson, in the Exchange National Bank Building. It was about the 27th or 28th of August, 1926. Mr. Johnson explained that he had been over the property and told me something about it. Mr. Clark was present at the time, and he said he had arranged to buy this property. I expressed some surprise at that, and said I did not know you could buy it. Clark replied there was a mortgage of $15,000 on it at the First National Bank at Muskogee, which he had already arranged to take over; he wanted $42,000 for the interest he was talking of purchasing; I figured for a while, and offered him $36,000. That was on the same day the original conversation was had. He told me Ingram would be over in a day or two to close the transaction.

"The morning of September 2d Mr. Clark and Mr. Johnson and a negro came to my house in a car; it was about a quarter of 8; Mr. Clark said, 'This was Leonard Ingram.' The negro that Clark told me was Leonard Ingram I learned later was Chauncey Davis. Clark said he had a deed from Ingram to himself, and that he was going to take it to Sapulpa and put it on record. I told him that Mr. Kelley has been trying to buy this property off and on for a long time, and asked him to have Kelley identify the negro Ingram, and Clark replied, 'I have al-

ready had Kelley identify him'; they then left. When I went down town, I went to Mr. Johnson's office, Johnson prepared the deed from Clark to me; prepared the proper transfer orders covering the transfer of the oil and pipe line. In a few minutes Clark came down and said Ingram was down in the Exchange National Bank; Mr. Johnson and I accompanied Clark down to the bank. I wrote my check to Clark for $36,000 in payment for a one-half interest in the Leonard Ingram royalty, and handed it to him; he indorsed the check. Mr. Smith, who was in the cage of the bank, handed him two packages of bills, one sum was $12,500, the other $15,000. Clark stated that Ingram was insisting upon having cash. There was some discussion of the $15,000 mortgage to the First National Bank of Muskogee and some other deed that had not been put of record. When I paid the money, I expected to get a release of the mortgage to the bank at Muskogee.

"I suggested to Mr. Clark in the bank that he had better accompany the negro to Muskogee for protection. Clark then left with the negro, whom I thought at the time was Leonard Ingram, but who turned out to be Chauncey Davis. There was a suit filed. I was served with papers on the Leonard Ingram half interest to quiet title; after the suit was filed I had a general conversation with Mr. Kelley; Mr. Clark was present. In this meeting Mr. Kelley explained how he had identified the negro as being Ingram. He said Mr. Clark drove up to where he was sleeping in Tulsa, blew his horn, and said, 'I have Leonard D. Ingram here.' Kelley said, 'I located him,' and I said, 'Hello Leonard, how are you?' I also asked a question, if he had seen some other chap; that was the statement made by Kelley."

The testimony of F. A. Boyles, taken in the preliminary trial was read to the jury. Boyles stated:

"On the morning of September 2, 1926, I resided on section 33, township 20, range 12, Osage county. In the early morning, possibly 2 or 3 o'clock, I don't know the exact time, Mr. Kelley and a negro man he introduced as Ingram and Mr. Clark came to my house in an automo-

bile; the horn sounded, and then I heard Mr. Kelley's voice. When he called my name I got up and went out to see what he wanted; I went out in my night clothes, and Mr. Kelley was by the fence. I had known him for several months. Mr. Kelley wanted to know if I would let him have the key to the office, he wanted to get the Indian Roll Book. At that time I was officing with James A. Watson, 518 Commercial building; I am still officing with him. I told Kelley I would not let anybody have the key. Mr. Kelley stated he wanted to get the roll number, and asked me if I would go down to the office with him to get it. I went with him to the office. The man who drove the car when we went to the office is the man Mr. Kelley introduced to me as Mr. Clark. We stopped the car at Fourth and Boulder, and Mr. Kelley and I went to the office; Mr. Clark and the negro stayed in the car; I think the car moved on. When we got to the office, Mr. Kelley looked into the roll book, made some notes on a piece of paper, and put it in his pocket, and we left the office and went to Fourth street, close to Boston, and got into Mr. Kelley's car and he took me home. While we were there, a man came from towards the Clinton building to Mr. Kelley, and a few words were spoken. We got into the car and went on.

"On the way down from my house to the office Mr. Kelley said that the negro was going to leave, and he said he wanted to get his signature before he left. He said he just come over from below Bristow; Mr. Clark, Mr. Kelley, the negro, and myself were the only ones in the car. After this occurrence, Mr. Kelley said it was a pretty good deal if he made it, and it was kind of me to get up at that time in the morning and go down there. 'If I get this over I will pay you well for your kindness.' I was not paid anything."

Chauncey Depew Twine testified, in substance, that his residence was Muskogee; that he was a graduate of Howard University; he practiced law in Muskogee. "I have known Earl R. Kelley since June, 1924; have seen him frequently since that time; I saw him about 9 o'clock

on the night of September 1, 1926, in the city of Muskogee; he came to the door of the Wilson Jones Drug Store and called Chauncey Davis. This drug store is located at 218 North Second street, two doors south of my office."

Chauncey M. Davis testified that he was a resident of Kansas City. Prior to that time he lived in Muskogee. He had known the defendant, Earl Kelley, since June, 1924; met him in Washington, D. C., while attending Howard University; the defendant was then trying to locate Leonard D. Ingram to buy his royalty interest—

"The next time I saw him was about August, 1926, in Muskogee; I saw him later in Muskogee several times. On the first day of September, 1926, about 6 o'clock in the evening, I had a conversation with him, and he said he wanted to go to Tulsa, that he was short of money, and wanted me to loan him $3. I did not have the money, and sent him to the Klar Pawn Shop, Third and Okmulgee; told him to tell Klar I sent him, they were pawnbrokers. He also told me some lawyer in Tulsa wanted to see him. I advised him I was leaving that night. The defendant then said he would let me know later. I saw him again about 9 o'clock at night down near the billiard parlor on Second and Court. He advised me he had called the parties and they wanted me to come to Tulsa; said he did not know who the parties were; he had talked through some one else.

"The defendant insisted that I come that night to Tulsa; I finally decided to go; he advised me he would be ready to start about 10:30; we drove to Tulsa, reaching there about 1:30 the morning of September 2d; Clark came out, and Mr. Kelley introduced me to Clark, and we talked a few minutes. Clark then told Mr. Kelley to get some attorney and go up to the office, I do not recall the name of the attorney. Clark told me to get out of the Kelley car and get into his car. Mr. Kelley then left. We drove to Fourth and Boulder in the city of Tulsa. Clark went around to what was the side of the Clinton

building and came back and said Kelley and the lawyer had not come, and we would go out and see what was the matter. We drove out to a house, and Mr. Clark honked his horn and a lady told us the parties had gone down town. We drove back and saw Mr. Kelley. When Mr. Kelley and Mr. Clark came back to the car, they said they would have to go out somewhere and get a book. We went out past the Tulsa Country Club and turned west and went some distance, and stopped at the residence of Mr. F. A. Boyles. Mr. Kelley got out and woke Mr. Boyles up to get a key to some attorney's office by the name of Watson, as I understood. Mr. Kelley returned to the car and said Mr. Boyles would not give him the key, and he would have to take Boyles down town with him. When we left the Boyles residence, Mr. Boyles, Mr. Clark, Mr. Kelley and myself were in the car. When we got back to the building, Mr. Kelley and Mr. Boyles went up in the building. Mr. Clark parked his car across the street on Fourth and Boston. Mr. Clark and Mr. Kelley were across the street from where I was for a short while. They came back, and Mr. Kelley asked me if I was hungry, and I told him I was, and he brought me a sandwich and bottle of beer. Mr. Clark and Mr. Joyce were standing in Minck's Cafe. When they came out of there, Mr. Clark and Mr. Kelley came to the car. They told me Mr. Joyce was a detective, and Mr. Kelley said he had to take him home. This was about 6 o'clock in the morning. Mr. Clark told Mr. Kelley they had better have me sign this. I said, 'Sign what?' and he said, 'Sign.' I told him I was not going to sign anything like that, and he says: 'Oh, yes, big boy, you will sign it or we will do away with you.' Kelley pulled a paper from his inside pocket, took out his pen, and turned the seat down, and said 'sign Leonard D. Ingram, N. B. 110' or something—he had to look at a piece of paper to see the number. I signed in my natural handwriting, Leonard D. Ingram, N. B. 110 or 222, 110—I have forgotten the number just now. After I had signed the paper, Mr. Kelley told Mr. Clark to meet him two miles south on the Bixby road at 10:30, and for him to go down to the train and tell the party he did not need the other

one. I don't know who he was speaking of. Mr. Clark went to his home and we had breakfast, and Mr. Clark drove out to the northeast part of the city to see a man by the name of Smith, and I forgot the other one, and we then came back to the Exchange National Bank."

The defendant, testifying in his own behalf, denied any connection with the forgery of the conveyance to the Leonard D. Ingram royalty interest. He admits he had been trying to purchase this interest since 1924. He made a trip to Washington, D. C., Norfolk, N. Y., and several other places trying to purchase the Ingram royalty interest. The witness Twine met him when he was on this trip, and Chauncey Davis was trying to assist him in locating Leonard D. Ingram. The defendant denied he came with Chauncey Davis from Muskogee on the night of September 1, 1926. He admits he was in Muskogee that day, and admits he ran short of money and went to the pawn shop and pawned his top coat for $3. Chauncey Davis says he saw the defendant in Muskogee on September 1, 1926, and the defendant told him he was out of funds and wanted $3 for gasoline to get back to Tulsa. The defendant admitted he was in Muskogee with F. E. Clark, that F. E. Clark furnished money to Napoleon Scott to go to Chicago to try to locate Leonard D. Ingram, and that Scott wired the defendant from Chicago with reference to his efforts to locate Ingram. The defendant also stated Clark paid him $2,500 to release any right he had in the effort to buy the Ingram royalty. Davis states he directed the defendant to Klar Bros., where he pawned his coat. Twine says he saw the defendant in Muskogee the evening of September 1, 1926, at the drug store where he called Chauncey Davis out; that he had known the defendant since 1924; Boyles says Kelley, Clark, and Chauncey Davis came to his house during the night of September 1, 1926, or the morning of September 2, 1926, and

woke him up for the purpose of getting, the Indian Roll Book. He got up and came to town with them, and Mr. Kelley secured the number.

This is a companion case to the case of Clark v. State, decided by this court May 24, 1930, and reported in 47 Okla. Cr. 379, 288 Pac. 489. The record in this case is voluminous. There were able counsel in the trial of this case both for the prosecution and the defense.

The case was bitterly contested by both sides. Of the 1,616 pages of the record at least one-fourth of the record is taken up with objections, rulings of the court, and exceptions. The testimony in this case is substantially the same as in the case of Clark v. State, supra, to which reference is made, and is sufficient to sustain the conviction, unless in the trial of the case the court. erred in the admission or rejection of the testimony, or in its instructions to the jury.

We will consider the assignments of error as they are discussed by the defendant. The first error assigned is, error of the court in overruling defendant's motion and demurrer to quash the information. It is urged by the defendant there is a fatal variance in the information and exhibit attached thereto, and that the information did not allege that Ingram actually had any such property or that any such property was in existence. The information does not charge that the name of Ingram was unauthorized, and the information does not charge the conveyance was delivered.

Section 2070, C. O. S. 1921, in part provides:

"Any person who, with intent to defraud, forges, counterfeits or falsely alters:

"First. Any will or codicil of real or personal property, or any deed or other instrument being or purport-

ing to be the act of another, by which any right or interest in real property is, or purports to be, transferred, conveyed or any way changed or affected; * * * Is guilty of forgery in the first degree."

The defendant in support of his motion and demurrer to the information cites many authorities, and especially relies upon Cook v. State, 23 Ariz. 55, 201 Pac. 397. An examination of the Cook Case shows that the forged check copied in the information purported to be signed by C. G. Powell, and in the trial of the case the check alleged to have been forged and introduced in evidence purported to have been signed by C. G. Powell, Superintendent, by ————————, Secretary, which clearly showed a variance in the instrument pleaded in the information and the one offered in proof. In this case the exhibit attached to the information alleged to be a copy of the document forged and the conveyance alleged to have been forged introduced in evidence were correct copies of the exhibit attached to the information. The facts in the case of Cook v. State, supra, and the case at bar are very different. The information in this case sufficiently informed the accused of the charge against him and so defines the offense that the accused, if convicted or acquitted, would be able to defend himself in case he is informed against or indicted again for the same offense by pleading the record of such former conviction or acquittal, and is good as against a motion to quash or demurrer. Whitfield v. State, 37 Okla. Cr. 37, 256 Pac. 68; Clark v. State, 47 Okla. Cr. 379, 288 Pac. 489.

The next question urged by the defendant is that the court committed error in denying the defendant, Kelley, the right to inquire of the jurors on their voir dire, after it was shown they had sat as jurors before, what their verdict had been. It is not disputed that liberal latitude

should be given the defendant in the examination of jurors in order that he may ascertain if there are any grounds for actual or implied bias, in order to enable him to properly exercise his peremptory challenges. It is not contended in this case that, by reason of a refusal of the court to permit the jurors to answer on their voir dire what their verdict had been in cases in which they had been jurors previous to the calling of this case for trial, it forced the defendant to exhaust his peremptory challenges and to accept jurors who were not competent jurors on the panel to try his case. One of the cases relied on by the defendant to sustain his contention is Temple v. State, 15 Okla. Cr. 176, 175 Pac. 733. In that case it was shown by the record that the jurors challenged for bias, on the day before they were called for trial in the Temple Case, had rendered a verdict convicting the same defendant of forgery, and it appears that the testimony in the first case involved controverting questions of fact in issue in the Temple Case, and that the same witnesses would be called to give the same testimony on an issue the same in both cases. Therefore the court held they would not be unbiased jurors. In this case no such question is raised and no facts introduced to show bias or prejudice on the part of either of the jurors impaneled to try the case. The court did not err in refusing to permit the jurors questioned on their voir dire to answer what their verdict had been in the trial of the case where they had previously sat as jurors.

It is next urged by the defendant that the court committed reversible error in not declaring a mistrial because Chauncey Davis, the principal witness for the state, stated before the jury that F. E. Clark, a codefendant, had been convicted by another jury. No authorities are cited in support of this contention, and, in view of the fact that

the court admonished the witness that he should answer the question and not make any voluntary statements, we do not think the rights of the defendant were prejudiced, and that the motion of the defendant to declare a mistrial was properly overruled by the court.

It is next urged by the defendant that no sufficient predicate was laid to make competent the testimony of F. A. Boyles. The witness F. A. Boyles lived in Osage county, near the edge of the city of Tulsa. A subpoena was issued to him, and the officer who undertook to serve it in the adjoining county and several other witnesses testified at the time the case was called for trial Boyles was out of the state. It is urged by the defendant that the statements of the witnesses that Boyles was out of the state is in the nature of hearsay testimony, and therefore not sufficient predicate to justify the admission of the testimony of Boyles taken in the preliminary trial.

In Henry et al. v. State, 32 Okla. Cr. 67, 240 Pac. 128, in the second paragraph of the syllabus, the court said:

"The proof that a witness is a nonresident of, and is absent from, the state, offered as a predicate for introducing in evidence a transcript of the testimony of such witness, taken at a preliminary hearing, is not incompetent as hearsay, although based upon statements made to the witnesses by whom such proof of nonresidence and absence is made, since the fact of nonresidence or absence can generally be proven in no other manner."

The record further shows that, when the testimony of Boyles was offered at the trial, by agreement of counsel for the defendant and the state, the defendant's counsel was given an opportunity to interpose objections to any question propounded to the witness in the prelimi-

nary, and did so, and secured a ruling of the court upon them before the answer was read to the jury.

Upon the showing made by the state, it was not error for the court to permit the testimony of Boyles, taken in the preliminary trial, to be read to the jury.

The defendant in his fourth assignment insists that the court committed error in refusing to admit in evidence the letter addressed to the Peabody Hotel, in Memphis, Tenn., requesting the hotel to send a witness to Oklahoma to testify as to the alleged flight of the defendant. The record has been carefully examined, and we fail to find where the refusal to admit the letter complained of by the defendant did in any way whatever bias or prejudice him. The witnesses from Memphis were cross-examined, and stated their expenses were to be paid. The state did not dispute the fact that the prosecuting witness and his counsel were anxious to have the defendant tried on the charge brought against him. The defendant contends that the court erred in permitting the state to call witnesses in rebuttal, contending that the witnesses were called back to the stand for the purpose of trying to get to the jury a last impression of the case. It may have been the intent of the prosecution when it called the witnesses in rebuttal to get a last impression in the case to the jury, but the record does not disclose that fact, and the court did not err in permitting the state to call the witnesses in rebuttal.

The defendant further contends that throughout the cross-examination the court unduly, and to the prejudice of the defendant, prevented certain questions being answered by the defendant which were legitimate cross-examination. Nowhere in the brief are the questions complained of set out, and we have no knowledge of what questions the defendant complains.

The defendant next complains of instruction No. 9, given by the court on the question of an accomplice. Instruction No. 9, as given by the court, correctly stated the law on the question of an accomplice as applied to the facts in this case, and the assignment does not possess sufficient merit to warrant a reversal.

It is next urged by the defendant that there is no evidence in the case implicating Kelley in the forgery of the mineral deed set forth in the information. While the evidence in this case is conflicting, the evidence on the part of the state connects Kelley with Chauncey Davis and F. E. Clark at different times from the 1st day of September, 1926, until the close of the transaction on the 2d day of September, 1926. While the testimony on behalf of the defendant denies any connection of the defendant with the transaction, and the defendant called a number of witnesses who testify in his behalf tending to establish an alibi for the defendant, and to show that the defendant was not connected with the forgery of the conveyance in any way whatever, the conflict in the testimony was settled adversely to the defendant, and this court has repeatedly held that, where there was any competent testimony to go to the jury, though the testimony was conflicting, it would not disturb the verdict.

It is next urged by the defendant in his ninth assignment: "That the corroboration of the witness Chauncey Davis was not sufficient to meet the legal requirements of the statutes"—citing many decisions in support of his contention as to whether the witness Chauncey Davis was an accomplice with the defendant Kelley.

The forgery of the conveyance was submitted to the jury by correct instructions of court, and the jury was confronted with the witnesses and saw their demeanor on the

stand, and had an opportunity to judge the truth or falsity of their evidence, and, after hearing all the evidence, the instructions of the court, and argument of counsel, by its verdict decided adversely to the defendant.

Many questions are argued at length by the defendant and the state. To specifically refer to and quote all of them would extend this opinion to unreasonable length. It is sufficient to say that the defendant was accorded a fair and impartial trial, that the court correctly advised the jury as to the law applicable to the facts in this case, and that there are no fundamental or prejudicial errors in the record sufficient to warrant a reversal.

The judgment is affirmed.

CHAPPELL and EDWARDS, JJ.; concur.